CLARENCE E. LEIGHTON, in Equity *vs.* ROSCOE G. LEIGHTON.

Somerset.　　Opinion June 14, 1898.

*Equity. Appeal. Trust ex maleficio. Deed.*

The parties are brothers. Their father conveyed all his real estate to the complainant, an unmarried son, taking back a life-lease secured by mortgage. There was also a contemporaneous oral agreement that such son should contribute towards the support of his aged parents during their natural lives; the expectation being that the son and the parents would live together upon their earnings and the income of the property. The son's marriage afterwards prevented their longer living together as a common family. At a later date, there being two mortgages on the estate, the respondent received an absolute deed of the property from the complainant, under a verbal agreement that the former should hold the title solely as security for the money he might advance for paying off the mortgages, promising to send to the latter a written agreement to that effect when he got home, being then away from his home, but never keeping such promise. Having sold one parcel of the estate for enough to pay off the mortgages and have eight hundred dollars of money besides, he assumed the position that he was the absolute owner of the remaining land and the money, which he should apply to the future support of the parents as he pleased; denying that the complainant had or could have any legal or equitable right in the present or future thereto.

On these, and other less important, facts it is by the court *held*, that the respondent be required to release all the remaining real estate, and pay over the money in his hands, to a trustee, to be appointed by the court, who is to be empowered to hold the land and money and administer the same, in the manner indicated in the opinion of the court, for the use and benefit of the parents as long as they may live, and to transfer any balance remaining unconsumed at their decease to the complainant. The court observes that, now as the control of the estate is judicially submitted to its hands, it becomes its duty to substitute for their benefit new equities for equities that are lost; equal but not entirely the same.

While it is a general rule of equity procedure that the decision of a case upon the facts by a single justice should not be overruled unless the appellate court is clearly satisfied of its incorrectness, especially when the credibility of witnesses whom such justice has seen and heard is an issue, still a hurried examination of a complicated case below may sometimes be less satisfactory than a deliberate re-examination of the case afterwards with the aid of a printed record.

IN EQUITY, ON APPEAL BY PLAINTIFF.

This was an equity appeal from the decision of a single justice sitting below. The bill sought to enforce a constructive trust upon a deed absolute upon its face. The plaintiff and defendant are younger and older brothers, the plaintiff being forty years of age and the defendant fifty.

The plaintiff's claim briefly stated is this: that on the eleventh day of April, 1895, he was the owner of real estate in Pittsfield worth $5500, upon which there were two mortgages then due amounting to about $1500, and which also was subject to a life-lease running to his father and mother also secured by a mortgage. The plaintiff, on that day, deeded to the defendant, his elder brother, all this real estate upon his promise to give the plaintiff a writing that he would take care of the mortgages, and give the plaintiff all the time which he needed to pay them in; or if the defendant should sell any of the land to the town, that he would pay off the mortgages, reconvey the balance of the unsold land, and pay the surplus money to the plaintiff.

The plaintiff signed and delivered the deed to his brother, the defendant, who promised to have his attorney draw up a writing which he would bring to the plaintiff; but when the plaintiff asked him for the writing, the defendant said that it could not be done, that it was all right, and the plaintiff should have the property back. The defendant never gave back the writing.

The case was submitted upon bill, answer and proofs. The defendant denied that he ever promised to give back such a writing; and charged that the plaintiff was under obligations to support his father and mother; and that about a year and a half before the deed was given, the plaintiff was married and took his wife home to live with his parents; that the wife treated her mother-in-law in such a way that they could not live together comfortably and happy, and the plaintiff thereupon voluntarily gave all of this property to his brother in order to get out of the trouble that existed between his wife and mother. The defendant admitted that he had sold the farm to the town for $2300, and has $800 after paying off the mortgages; also that the defendant

promised to take care of and provide for the father and mother as long as they might live.

*Forrest Goodwin*, for plaintiff.

*J. H. and J. H. Drummond, Jr.*; *and E. N. Merrill* for defend-ant.

SITTING: PETERS, C. J., HASKELL, WISWELL, STROUT, SAVAGE, FOGLER, JJ.

PETERS, C. J.    The parties to this bill are brothers, being sons of Ira and Eunice Leighton who for many years have lived in Pittsfield in this state: There were eight sons in the family, seven of them now living, the complainant being the youngest.  To seven of the sons the father gave their time after arriving respectively to the age of eighteen, and to the complainant, whom he called, as he says, his home boy, he intended to give what was left of his estate, when he and his wife should have passed away.  The complainant remained at home until very lately and is now (1898) forty years old.  After coming of age, he had the principal care of his father's farm upon which he and his father and mother lived together for many years.  The father testifies that he has not himself done a full day's work for twenty years, being afflicted with asthma, but his wife thinks his disability on that account has not prevented his doing a fair day's work for more than twelve years.  The father is now about eighty-four and the mother about eighty-one years old.  The first act by the father in pursuance of his intention to provide an inheritance for the complainant was the making of a will in his favor, the precise terms of which are not known to us, as the instrument seems not to have been printed in the report.  But, however that may be, the father, July 29, 1890, deeded all his real estate to his son, taking back a lease to continue for the lifetime of himself and wife and the survivor of them.  The real estate consisted of a dwelling-house in Pittsfield fitted for two tenements, one above and one below, a farm of about twenty acres, situated about a half-mile out of the village, with a house on it, and a pasture lot of about twenty acres more in the neighborhood of the

farm; the three pieces being worth somewhere between five and six thousand dollars, subject to mortgages thereon amounting to about fifteen hundred dollars. This conveyance was not a sudden or rash transaction, for it had been previously talked of and discussed in the family, nor could it have been induced by undue pressure, as the father was then evidently a man of more will and intelligence than was the son.

The old couple and the son constituted the family after July 1890 as before, without any change until December 1893, when the son got married and brought his wife home, all living in the village-house together, first as one family and afterwards as two. After a while the wife and mother had some disagreement between themselves, and the consequences which it occasioned forms a feature in the after family history which will be noticed hereafter in another connection.

In the fall of 1894 and early in 1895, the complainant began to feel an anxiety about the mortgages subsisting on the property, and particularly so as a $500 note was coming due at the bank in the next April, payment of which could not be very well postponed. This condition of things led him to consult a good deal about his affairs with the respondent. There had been an expectation in the family that the town would sooner or later buy the farm-lot, as it soon afterwards did for an extension of the limits of its cemetery, but that prospect was not at that time promising enough to relieve present embarrassment. So the complainant appealed to his brother for assistance in taking up the $500 note, feeling an assurance he would himself have no difficulty in managing the balance of the indebtedness. And the two brothers had a number of consultations together on the subject, the result of which was that by deed dated April 11, and acknowledged April 30, 1895, the complainant, his wife joining in the deed to relinquish her right of dower, conveyed to the respondent all of the real estate thus received from his father. Sometime afterwards, the case not showing when, the respondent sold the farm to the town for the sum of $2300, and with it paid off all the incumbrances on the property, having $800.00 over, which he says he deposited

in some Portland savings bank in his own name, to be used as occasion requires for his father's and mother's benefit.

Here we strike the essential point in the case, and the natural inquiry is what was the purpose of the conveyance from the complainant to his brother? What motive or consideration, legal or moral, induced it? The complainant swears, as he alleges in the bill, that the purpose was for securing his brother for such advances as he might make for taking up such mortgage indebtedness, and further for the better accomplishment of a sale of the farm to the town if that could be done; that there was no intention to make any absolute gift of the property to any one for any purpose; that the expectation had been that he was to secure his brother by a mortgage and not by a deed; that the brother was to send a mortgage to him to be signed; that when a deed was sent him instead of a mortgage, he and his wife were unwilling to execute it, and retained the instrument until the respondent came to town, his residence being in Portland; that when the complainant and wife afterwards expressed to him their objection to giving a deed, and their willingness to substitute a mortgage instead, he represented that an additional mortgage on the premises would hurt the anticipated sale to the town, and said that an agreement back would be preferable because then no other persons would know what was going on, and that he would get his lawyer in Portland to draft one which he would send to them; that relying on these and other similar representations the complainant and his wife were induced thereby to execute the deed; and that the respondent afterwards put him off from time to time with different excuses for not sending the expected document until there finally came a refusal to do anything about the matter, the result being that he is to-day deprived of the possession of all the property and all title thereto with nothing to show for it.

The respondent, wholly denying the charges made against him by his brother, sets up that the deed was to enable him to provide a support for his father and mother during their lives; that the complainant had failed in carrying out the designs entertained by his father and himself when the conveyance was made to him in

1890; that on that account and because of the existence of an estrangement between his wife and his mother he willingly surrendered all the property to him for the benefit of the father and mother, even voluntarily seeking the opportunity to do so; that he (respondent) made no promise of any kind whatever to restore any part of the property to the complainant, and that there was no reason for expecting he would do so; and that there was nothing done or said in the transaction in question in consequence of which the complainant has any right to believe that he has or can have any present right in the remaining real estate or the $800.

The plaintiff and his wife testify positively to the asseverations made by the plaintiff, and their testimony is not only natural and consistent, sustaining itself by its own coherent strength, but is vindicated by very important circumstances, while we feel compelled to regard the prevaricating testimony of the respondent as not supported on this essential point by any other evidence, and as totally insufficient to withstand the evidence produced against it.

The version of the defense is on its face an improbable one, that the complainant would so readily renounce his title in such a valuable property for such trivial cause, without any expectation of its return to him in some form or condition, in whole or part, at some time or other. The complainant expresses his own interpretation of the transaction by his sending seasonable and frequent letters to and demands upon respondent as soon as his suspicions of an imposition were aroused. Still the respondent produces none of them, though called for. Why did the complainant and wife keep the deed and so long refuse to execute it, if it was understood by them that they were to give up everything and receive nothing? What was there to hesitate about? Is it probable that complainant's wife would have relinquished her dower, had she understood she and her husband were to receive no consideration or advantage present or future for it, but on the contrary were to be deprived absolutely of all they had in the world? The respondent came to Pittsfield, and, as he says, talked with them from a half to three quarters of an hour and they then signed the deed. They say themselves that his explanations and promises were what

then induced them to execute it. He says the trouble between complainant's wife and mother was the inducement. Would not the wife have resented such a proposition on such a ground? Is it at all probable that a word was said on that subject during the time the three were together? He pretends he cannot remember a word said in that interview but he knows that what he did say removed any objection against signing the deed. A strong if not conclusive circumstance showing that the complainant's version is true and that of the respondent untrue is evidenced by the fact that, after his deed to his brother, the complainant continued to live in the house with his parents, and to carry on the farm precisely as before, supplying the old couple as before with, as he and his wife say, milk daily, apples occasionally, and eggs, butter and vegetables frequently. The respondent seeing the force of this circumstance attempts to explain that his brother was on the farm by an agreement with him or under a permission from him. But this the complainant denies, and evidently the parents did not so understand it, and circumstances contradict it. The next day after the deed was executed the $500 note at bank was taken up and a new note given in payment signed by complainant and respondent and another person. Why was complainant on this note, if he was then without property and worthless, the brother having assumed, as he says, the payment of all the notes, and owning all the property? A still stronger circumstance in refutation of respondent's story is the fact that, when the renewal note was coming due, he wrote complainant to furnish some funds towards its payment. That would be consistent with complainant's position that his brother was to pay the note for him, but inconsistent with the brother's position that he was to pay it on his own account alone. Stoutly denying that he made any such request, and asseverating over and over again that he did not expect any funds from his brother and that there was no reason why he should, he was confronted with this extract from his letter to his brother dated October 17, 1895: "Please let me know when 'that note is due at the bank try and have sunthing to pay on it when it is due." Space can be afforded here for only a single question and answer

from the further long and damaging examination that ensued: "Q. What did you mean by asking Eugene to have something to pay on that note when it was due?" "A. He was — I let him go down there and have the cows and what he could make but he paid nothing — pay the taxes on it and what — that he might get in debt — that is he should not run me in debt any — and I didn't know but — if he had something toward the taxes I would put it in and pay the note but he wasn't to pay nothing towards the note." He after this admits in his testimony that he had at that time paid no taxes and that there were none to pay and that all taxes had then been paid by the mother out of her own money and not from his.

His denials in some instances are equal to admissions. In his answer to the bill he says the land was sold to the town with the consent of the father and mother and "the acquiescence of the complainant." The word acquiescence is an artful one in this connection, and still there is a lurking confession in it. Why is it of any importance that the complainant acquiesces in the sale of property, if he has no interest? He further answers that "he admits that *after* the property had been conveyed to him the complainant did ask him in relation to the disposition of what might be left after their parents' death, and he told the complainant he would do what is right." He frequently repeats the same idea in his testimony, but the idea fits awkwardly with other statements. He wants it understood that all promises or assurances were made *after* the conveyance, but would it not be more reasonable to believe that, if made at all, they were made before or at the time of the conveyance?

He writes in a letter dated December 17, 1895, in answer to complainant's importuning letters to him asking for the written agreement promised to him: "I shall do by you what is right if you do as you should now Eugene my advice to you is to keep right along and you will come out all right if you do not and mean to make trubble you must take the consequence and no one will be to blame but yourself." On November 24, 1895, he wrote his brother, this among other things: "You need not give aney fear

but what after they (their parents) have passed away but what you will get all that belongs to you if you do right and I know you will." He expresses himself in a similar way when, in speaking of the interview at the time the deed to him was executed, he says: "Something was said when I started to go out. Eugene said something about disposing of the property when father and mother was dead, and I made the answer and said, Eugene, I will do what is right." Repeatedly does the respondent admit that "after" the transaction he said he would do right or something to that effect, but he thinks it important to deny any such prior or contemporaneous promise.

He says at another place in his testimony that the disposal of the estate after the death of his father and mother "was left to my own discretion," rather a feeble expectancy for the complainant to accept as the only consideration for the conveyance of a valuable real estate. How can the complainant depend upon justice being done to him when the respondent has the power to do for him as he pleases, but who threatens consequences upon his head unless he submissively obeys his will as the master of the situation? Is it equitable and just for a court to trust the destinies of the complainant, who is asking its protection, in the hands of his more intelligent and apparently designing brother? And what security too have the aged parents that they will receive protection at his hands when they have no written obligation from their self-constituted guardian, who up to the time of giving his testimony had not contributed for their support, as he felt compelled to say, a single dollar in his lifetime? Nor had he as yet even used any money for that purpose acquired from the sale of land to the town, they having hitherto had other sources of income. What family jealousies might by and by arise should the respondent have an unlimited discretionary power to distribute the estate or retain it to himself in the future as he pleases,—not as his father would, or the complainant could—but as he sees fit? Indications of family differences are already seen on the surface in this controversy.

The complainant says the reason for his urgency to obtain assistance from his brother was because of his apprehension of

being immediately pressed for payment of one of the notes, while the respondent says the urgency was to substitute the respondent in the complainant's place on account of the domestic trouble at home. The following questions and answers illustrate the respondent's pretended view. "Q. Didn't he say when he was going to get the money and ask you to help him out? A. He asked me to help him out in the way of the family trouble. Q. Did he ask you to get the money to pay these notes? A. No, not for that purpose." What necessity was there for raising money unless for the purpose of paying notes? Could the raising of money compose the family differences? At any rate it had no effect upon them, for, as the respondent was forced to admit, and as we have substantially said before, the family relations remained for four to five months precisely the same after as before the deed, both families remaining during that time in the same house as before, and the complainant continuing in the same possession and management of all the property as before. In August following the deed in April the complainant moved from the house in the village to the farm a half a mile away.

It is, indeed, unfortunate that there should have been any family disturbance, and we can see in the testimony no occasion for it, the only explanation being that the two woman-wills did not blend together. The old gentleman and lady have on this account, and probably through other influences, come to prefer that the respondent and not the complainant should own the property. But that is not for them to decide. They speak in affectionate terms of the complainant, and really make no charges against his wife, excepting that, as the old lady expresses it, "she wanted to rule the house," admitting that she was a good housekeeper, of cleanly habits, and a lover of work. The reason she appeared lordly to her was because she wanted to do all the work to the exclusion of work by the mother. Other witnesses testified that she was lady-like, and she certainly appears so as a witness. Each charges that the other was silent and sullen sometimes. The young wife voluntarily did all the house-work, including milking and caring for the milk and selling it. She also for a portion of the time worked out

in a manufacturing shop. It certainly should not be regarded as an offense against the family that the complainant married her.

The defense invokes the rule that the decision of any fact by a judge below should not be overruled by the court above unless the appellate court is clearly convinced of its incorrectness, the burden being on the appealing party to prove the error. Such is the general rule, but it does not necessarily require proof beyond a reasonable doubt. And sometimes circumstances and conditions are to be considered which prevent the rule applying so literally as it otherwise would. A hurried examination of a long and complicated case below may not be so satisfactory as a deliberate re-examination of the case afterwards with the aid of a printed record. Of course, one who sees and hears the witnesses can judge of their credibility better than others can who merely review the printed testimony. We have the impression that the difficulty of formulating a decree upon some middle ground, that would afford protection to the aged couple who are interested in the controversy between the brothers, might have influenced the learned justice in adopting a result not on the whole the most equitable or advisable.

We have been discussing the merits of this controversy as it exists between the direct parties to the bill, but it will very readily be seen that other very important interests are indirectly involved. There are equities belonging to the parents of the parties which cannot be ignored. The old people have a life-lease of the property, and equitably a greater interest than that. It was a part of the understanding between the complainant and his father and mother, when they deeded to him and took a lease back, that they were to enjoy his care and attention and have the benefit of his services towards their support. The complainant admits in his bill that at that time "he entered into an oral agreement with them to contribute to their support during the period of their natural lives;" and the idea undoubtedly was that they were to constitute a common family. By a change of circumstances the old people are deprived of such privileges. And now while the control of the estate is judicially submitted to our hands it becomes our duty to substitute for their benefit new equities for equities that are lost; equal but not

entirely the same.    To accomplish such a result, we think the old people should have annually such portion of the interest accruing from the eight hundred dollars of money as may, in addition to any and all other income, be necessary for their support; and, if such interest shall not be sufficient for such purpose, then to have any portion of the principal of the money necessary.    And if in the future the money referred to becomes entirely expended, then the old couple and the survivor of them should have a lien on the real estate for the purpose of producing, by sale, lease or mortgage, means sufficient for such support; the scheme being to utilize the property for the economical support of the father and mother during their natural lives, and to carefully preserve any remainder for the complainant.    And such was evidently the prime purpose of the original transaction.

This plan can best be carried into effect through the intervention of a trustee, to be appointed by any justice, to which trustee all the real and personal estate shall be conveyed by the respondent, unless such respondent is himself appointed such trustee.    The trustee shall give a bond in a reasonable amount to be approved by the judge who fixes the final decree.

> *Decree below set aside, and a new decree to be entered in accordance with this opinion, with costs for complainant.*